UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

JD1, JD2, and JD3,[1]     )
            )
  Plaintiffs,     )
            )
  v.         )    Case No. 1:21-cv-521
            )
CANISIUS COLLEGE, NATHAN )
HUCKLE, WILLIAM MAHER, and )
DONOVAN GLAVIN,    )
            )
  Defendants.     )

## ORDER ON MOTION TO DISMISS
### (Doc. 12)

Former Canisius College student athletes JD1, JD2, and JD3 sue the College and Canisius cross-country/track-and-field head coach Nathan Huckle, Canisius athletic director William Maher, and Canisius student-athlete Donovan Glavin. Plaintiffs allege that Defendants Canisius, Huckle, and Maher "directed, controlled, managed, and conducted the Canisius College Cross-Country/Track and Field Team in a manner which was hostile and discriminatory toward women and lesbians, and which fostered, promoted and condoned harassment, abuse and even sexual assault against women and lesbians." (Doc. 1 ¶ 26.) Plaintiffs further allege that Donovan Glavin—a male athlete on the co-ed team with Plaintiffs—sexually assaulted all three Plaintiffs. (*Id.* ¶¶ 54, 58, 69.) Plaintiffs also allege that they were subjected to retaliation for opposing and complaining of this alleged conduct. (*Id.* ¶¶ 27, 82.)

Plaintiffs bring ten causes of action and seek damages, injunctive relief, and punitive damages. Defendants Canisius College, Nathan Huckle, and William Maher (the "College

---

[1] The court has granted Plaintiffs leave to proceed anonymously as Jane Does ("JD") in this case. (Doc. 8.)

Defendants") have filed a motion under Fed. R. Civ. P. 12(b)(6) seeking dismissal of most of the claims against them. (Doc. 12.)[2] The court heard argument on the motion on January 24, 2022 and has considered the parties' post-hearing filings. (Docs. 28, 29, 30.)

## Background

The Complaint includes the following allegations.[3] Canisius College is a Jesuit college located in Buffalo, New York. (Doc. 1 ¶ 10.) Defendant William Maher assumed the position of Athletic Director at Canisius College in 2005. (*Id.* ¶ 12.) Maher hired defendant Nathan Huckle to coach the running program at Canisius. (*Id.*) Huckle began coaching the Canisius cross-country/track-and-field team in 2011 and is currently the head coach of that team. (*Id.* ¶ 24.) At all relevant times, the College had a single cross-country/track-and-field team for both men and women. (*Id.* ¶ 28.)

Plaintiffs allege that at the time of Huckle's hiring there was "publicly-available information that should have led to a deeper investigation into his appropriateness as the head coach of a co-ed program." (*Id.* ¶ 18; *see also* Doc. 28-1 ¶ 26.) Plaintiffs allege on information and belief that, before his employment with the College, "Huckle was employed by the Brighton Central School District ['BCSD'] as a 7th and 8th grade English teacher and the varsity track and field and/or cross-country coach." (Doc. 28-1 ¶ 28.) They allege on information and belief that

---

[2] Defendant Glavin has filed an Answer. (Doc. 21.) He does not seek Rule 12(b)(6) dismissal of any of the claims against him.

[3] In opposition to the College Defendants' motion to dismiss, Plaintiffs offered further allegations relating to Count VII. (*See* Doc. 22-1.) At the January 24, 2022 hearing, the court authorized Plaintiffs to present an amended complaint with additional allegations relevant to Count VII and to JD3's retaliation claim. Plaintiffs filed a timely proposed amended complaint. (Doc. 28-1.) It contains the same allegations as the original Complaint but with some additional allegations of fact. The following background is drawn primarily from the original Complaint, but with some citations to the new allegations in the proposed amended complaint.

"there were, and are, copious reports, information, and indications that during his employment with that school district, Defendant Huckle had inappropriate contact and/or relationships with underage female students who he taught and/or coached." (*Id.* ¶ 29.) According to Plaintiffs, witnesses reported the following about Huckle's conduct at BCSD:

- Huckle "regularly behaved in a discriminatory, harassing, and abusive manner toward the girls on the team, while treating the boys with privilege and preference." (*Id.* ¶ 30.) "Girls on the team were berated and ridiculed or ignored while boys were treated as friends and peers by Coach Huckle." (*Id.*)

- Huckle "treated certain girls on the team with preference and privilege based on the girls' willingness to tolerate inappropriate levels of familiarity and/or intimacy from Defendant Huckle." (*Id.* ¶ 31.)

- "[I]t was an open secret in and around the school and community that Defendant Huckle had an inappropriate, intimate, dating and/or sexual relationship with at least one and potentially more than one underage girls who Defendant Huckle taught and/or coached." (*Id.* ¶ 32.)

- "Huckle made inappropriate and harassing comments to girls in 7th and 8th grade about their bodies and/or legs under the guise of recruiting those girls to participate in the cross-country or track team." (*Id.* ¶ 33.)

- "One witness reports that Defendant Huckle brought her up in front of a 7th or 8th grade classroom full of students while she was wearing shorts and measured her legs." (*Id.* ¶ 34.)

- "At least one witness reports that Defendant Huckle commented to the 7th or 8th grade class of students that when he was in college he could spot a female freshman a mile away." (*Id.* ¶ 35.)

Plaintiffs further allege that numerous BCSD students and parents reported concerns about Huckle's "treatment of female students and athletes and his inappropriate relationships with certain girls to the School District administration." (*Id.* ¶ 36.) They allege, upon information and belief, that Huckle was "forced, and/or allowed, to resign from his employment with the Brighton School District because of suspicions and/or accusations concerning his inappropriate contact and/or relationships with female students." (*Id.* ¶ 37.) Canisius College hired Huckle in or about 2011. (*Id.* ¶ 25.)

Plaintiff JD2 and defendant Donovan Glavin both began attending Canisius College as student-athletes in August 2016. (Doc. 1 ¶¶ 13, 21.) The previous year—in 2015—the College was the subject of a federal investigation regarding how it handled a complaint of sexual violence. (*Id.* ¶ 49.) The federal investigation was reported in the local media. *Canisius College Under Federal Investigation*, WGRZ-TV, https://www.wgrz.com/article/news/education/ canisius-college-under-federal-investigation/71-128198884 (Jan. 21, 2015).

Glavin sexually assaulted JD2 in his dorm room after an off-campus team party on August 28, 2016. (Doc. 1 ¶ 54.) On February 25, 2017, Glavin verbally threatened JD2 after she refused to go home with him, claiming that he deserved to have sex with her and that "last time wasn't good enough." (*Id.* ¶ 62.)

Plaintiff JD1 began attending Canisius College as a student-athlete in August 2017. (*Id.* ¶ 20.) Huckle promised her a safe environment and to develop her full athletic potential. (*Id.* ¶ 95.) But according to the Complaint, most of the male athletes on the team that Huckle

4

coached "had a lack of respect for the female athletes on the team and for women in general."
(*Id.* ¶ 46.)

Plaintiffs allege that the team was characterized by a "general male culture." (*Id.* ¶ 43.)
That "culture" allegedly included "providing underage female athletes with alcohol and/or
marijuana in order to take advantage of them sexually once they were intoxicated." (*Id.*)
Plaintiffs allege on information and belief that "some of these incidents were reported to
Defendant Canisius anonymously through Callisto, but no action was taken." (*Id.* ¶ 44.)[4]
Plaintiffs further allege that Huckle "made it known that he expected female athletes to attend"
team parties, and that at the parties the female team members were allegedly plied with alcohol
and marijuana. (*Id.* ¶¶ 45, 52–53.)

On or about September 1, 2017, JD2 reported the August 28, 2016 sexual assault to an
assistant coach. (*Id.* ¶¶ 54–55.)[5] The Complaint does not explicitly state whether JD2's report
identified Glavin as the assailant or whether she identified the precise date or location of the
assault. The Complaint also does not state whether JD2 requested an investigation or any
corrective measures. The assistant coach conveyed JD2's report to Dr. Terri Mangione, who was
Canisius College's Title IX coordinator at the time, and also to the college's Associate Athletic
Director Tracy Murphy. (*Id.* ¶ 56.) "Subsequently, the assistant coach spoke with AAD Tracy

---

[4] It appears that Callisto is a third-party technology designed to prevent serial sexual
assault. *See* https://www.mycallisto.org/about#faq (last visited May 16, 2022).

[5] The relevant allegation in the Complaint appears immediately after paragraph 54—the
allegation that Glavin sexually assaulted JD2 in his dorm room after an off-campus team party
on or about August 28, 2016—and states: "Plaintiff JD2 reported this assault to an assistant
coach of the Cross-Country/Track and Field [team] on or about September 1, 2017." (Doc. 1
¶ 55.)

Murphy more than once about these issues in the Cross-Country/Track and Field Team, and with Lisa Liotta who replaced Tracy Murphy sometime in the Spring of 2018." (*Id.* ¶ 57.)

On or about December 15, 2017, Glavin sexually assaulted JD1 at an off-campus team party. (*Id.* ¶ 58.) In or about February 2018, JD2 advised Huckle of Glavin's 2016 assault of her and of Glavin's December 15, 2017 assault of JD1. (*Id.* ¶ 60.) JD2 also advised Huckle of "other aggressive, hostile and abusive conduct by Glavin toward women." (*Id.*) Huckle forwarded those reports to one or more members of the Canisius College administration, its Athletic Department, and/or its Title IX Coordinator. (*Id.* ¶ 61.)

In spring 2018, on a rainy day before the teams were going to run outside, Huckle yelled at JD2 in front of everyone for wearing a raincoat inside. (*Id.* ¶ 32.) He forced JD2 to take the raincoat off. (*Id.*) JD2 was embarrassed. (*Id.*) Plaintiffs cite that as one example of Huckle treating female team members as inferior to male team members. (*Id.* ¶ 29.) They assert that Huckle repeatedly called out female team members in front of the entire team and made them repeat drills and practice workouts but did not subject males to that treatment. (*Id.* ¶¶ 30–31.) They also assert that:

- male athletes were given Nike apparel but female athletes were not (*id.* ¶ 35);

- Huckle focused his coaching time and effort on the male team members (*id.* ¶ 36);

- during certain segments of team practice Huckle would forbid the women from talking and would scream at them if they talked (*id.* ¶ 37);

- Huckle violated NCAA policy by forcing female athletes to share beds for away meets; he did not require male athletes to share beds (*id.* ¶¶ 38–39);

- Huckle forced JD1 and JD2 to share beds with other women even though he knew JD1 and JD2 were dating (*id.* ¶ 39); and

6

- Huckle accused the female athletes of spraying perfume on the bus when in fact the scent came from a yogurt that an athlete was eating (*id.* ¶ 40).

In or about March 2018, JD1 and another female team member talked with Huckle about Glavin. (*Id.* ¶ 63.) Huckle responded, in effect, that "I can't kick someone off the team for being a jackass." (*Id.*) He suggested that JD1 and her teammate share their concerns with incoming female members of the team. (*Id.*) But in May 2018, Huckle held an end-of-the-year meeting with the female team members and directed them not to say anything about Glavin's conduct to the incoming freshmen and to instead "let them make up their own minds." (*Id.* ¶ 64.)

Plaintiff JD3 started at Canisius College as a student-athlete in August 2018. (*Id.* ¶ 22.) Huckle persuaded her to join the cross-country/track-and-field team by offering her a scholarship that he alleged to be "double" what any other athlete had ever been awarded. (*Id.* ¶ 102.) He then called JD3 out at drills in front of the whole team, often making her repeat drills while everyone was watching. (*Id.*)

In August 2018, team members observed Glavin on more than one occasion luring JD3 into his dorm room by moving her possessions into his room when she was under the influence of alcohol. (*Id.* ¶ 66.) Team members attempted to intervene on JD3's behalf on these occasions with "limited success." (*Id.* ¶ 67.) One female team member reported Glavin's conduct toward JD3 during this period to Huckle but Huckle did nothing. (*Id.* ¶ 68.) On or about August 24, 2018, Glavin raped JD3 at an off-campus team party. (*Id.* ¶ 69.)

In or around September 2018, JD3 stopped attending the team parties that Huckle expected the female team members to attend. (Doc. 28-1 ¶ 104.) Thereafter, Huckle contacted JD3's parents and falsely represented to them that the male student JD3 was dating was not of good character and would be a bad influence on JD3. (*Id.*)

Huckle required JD2 to take a personality test alone in his office in fall 2018. (Doc. 1 ¶ 33.) She was the only one that he required to take this test. (*Id.*) Huckle told her the results of the test indicated that their personalities "were not compatible." (*Id.*) He told her that he thought she would be a "rebel" personality, which he thought was undesirable. (*Id.*) On September 14, 2018, during a team trip, Huckle pulled JD1 and JD2 outside the team bus and publicly chastised them, asserting that they and their same-sex relationship were bad for the team. (*Id.* ¶ 34.)

On at least three occasions in September and October 2018, Huckle required JD3 to engage in 20–30 minute "guided visualization" sessions in his office. (*Id.* ¶ 41.) These occurred with the door closed and with only Huckle and JD3 present. Huckle directed JD3 to sit silently, keep her eyes closed, and listen to him speak. (*Id.*) These sessions made JD3 extremely uncomfortable. (*Id.* ¶ 103.) With her eyes closed, she could not see what Huckle was doing. (*Id.*)

In or around October 2018 Title IX Coordinator Dr. Mangione met with several female team members. They repeated their concerns and reports of sexual harassment, discrimination, and sexual assault. (*Id.* ¶ 76.) Dr. Mangione asked several of the women to submit written complaints and initiated a Title IX investigation. (*Id.* ¶ 77.) Plaintiffs assert that the investigation was "belated." (*Id.* ¶ 75.) Moreover, the investigation was limited to Glavin's sexual assaults of JD1 and JD2; it did not include an investigation of Huckle. (*Id.* ¶ 78.) At the conclusion of the Title IX proceeding, Glavin was ostensibly suspended from the team. But he was not expelled from Canisius "and no measures were put into place to make sure Plaintiffs did not have to face their assailant while they attempted to finish their education." (*Id.* ¶ 80.) Although suspended from the team, Glavin continued to train with the team; he joined the male team members for training runs. (*Id.* ¶ 81.) Plaintiffs allege on information and belief that

Huckle was aware of and condoned Glavin's continued training with the team despite his suspension. (*Id.*)

On or about November 12, 2018, Huckle summoned JD1, JD2, and another female team member to a meeting in his office. (*Id.* ¶ 83.) He told them he was making an audio recording of the meeting. (*Id.*) His statements and demeanor during the meeting caused all three women to feel pressured to resign from the team. (*Id.*)

On or about December 6, 2018, Huckle met with JD2 in his office, ostensibly for an "end of season" meeting. (*Id.* ¶ 84.) Huckle's conduct during this meeting caused JD2 to feel threatened and uncomfortable. (*Id.*) When she chose to leave, Huckle chased and screamed at her. (*Id.*) Other students witnessed that incident. (*Id.*)

On December 7, 2018, two other students sent lengthy letters to Canisius College President John Hurley, each reporting a "detailed and extensive array of concerns and complaints about sexual harassment, discrimination, sexual assault, and retaliation in the Cross-Country/Track and Field team generally, and on the part of Defendant Huckle specifically." (*Id.* ¶ 85.) The letters also expressed concern about the College's failure to respond effectively to those problems. Plaintiffs allege on information and belief that there was no response to and no action taken based on those letters. (*Id.*)

On December 10, 2018, JD2 met with Huckle and with Senior Womens' Athletic Director Lisa Liotta. (*Id.* ¶ 86.) During that meeting Huckle accused JD2 and JD1 of "micro-aggressions," apparently for speaking to each other during team practices. (*Id.*)

JD1 and JD2 resigned from the team in February 2019. (*Id.* ¶¶ 20, 21, 87, 88.) JD1 later transferred to another school to finish her education. (*Id.* ¶ 87.) JD3 resigned from the team in June 2019. (*Id.* ¶¶ 22, 89.) At the time of her resignation she emailed members of the Athletic

Department in which she referenced the reasons for her resignation from the team, "including her assault and other conduct of the Defendants." (Doc. 28-1 ¶ 106.) She also met with Deputy Title IX Coordinator Connie Pileri to discuss those issues. (*Id.* ¶ 107.) After JD3 resigned, Huckle emailed the entire team "blaming and embarrassing Plaintiff JD3" for her decision to leave the team. (Doc. 1 ¶ 90.)

After resigning, to keep their scholarships, JD1 and JD3 were required to sign agreements requiring them to perform service in lieu of participating on the athletic team. (*Id.* ¶ 91.) Among other things, they were required to do laundry for all the other sports teams. While doing this service work, JD2 and JD3 were "forced to see all the people that were their former teammates." (*Id.*) Two members of the team harassed JD2 on one occasion. (*Id.*)

Plaintiffs filed their Complaint in this court on April 19, 2021. (Doc. 1.)

## Analysis

The College Defendants' Rule 12(b)(6) motion challenges most of the claims asserted in Plaintiffs' ten-count Complaint. In response, Plaintiffs withdraw some of the challenged claims, offer to amend the Complaint as to some of the claims, and oppose dismissal of some claims. (*See* Doc. 22.) The College Defendants reply that the remaining challenged claims should be dismissed. (Doc. 25.) The court analyzes each claim in turn after briefly reviewing the Rule 12(b)(6) standard.

On a Rule 12(b)(6) motion, the court's task is to determine whether, accepting as true the complaint's non-conclusory allegations, "and drawing all reasonable inferences in favor of the non-movant, plaintiffs have stated a facially valid claim." *Ocasio v. City of Canandaigua*, 513 F. Supp. 3d 310, 319 (W.D.N.Y. 2021) (cleaned up). "In order to be found sufficient, a pleading must set forth sufficient facts to suggest that a cause of action is legally plausible." *Id.*

(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Ultimately, where a plaintiff has not nudged their claim across the line from conceivable to plausible, their complaint must be dismissed."  *Id.* (cleaned up).

## I.    Title IX Discrimination (Count I)

Title IX of the Education Amendments Act of 1972 states, in pertinent part, that "[n]o person in the United States shall, on the basis of sex, be . . . subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Plaintiffs originally brought their Title IX discrimination count against all defendants.  However, Plaintiffs do not oppose dismissal of Count I against individual defendants Huckle and Maher.  (Doc. 22 at 2.)  Defendant Glavin allegedly perpetrated the sexual assaults but he has not filed a Rule 12(b)(6) motion.  The court accordingly considers the plausibility of Count I against Canisius College.

Plaintiffs assert that the College "allowed and fostered an educational and athletic environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive, and retaliatory."  (Doc. 1 ¶ 110.)  They further allege that the College "tolerated, condoned, ratified, and/or engaged in the sexually abusive educational and athletic environment, or in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action."  (*Id.* ¶ 111.)  Plaintiffs assert three theories of liability under Title IX: (1) "pre-assault" claims; (2) "post-assault" claims; and (3) discrimination/sexual harassment.  (Doc. 22 at 4.)  The court considers each of these theories against the College below, beginning with the latter.

A.      **Discrimination/Sexual Harassment**

1.      **"Equal Treatment"**

The College perceives Plaintiffs' third theory to include an "equal treatment" claim as described in *McCormick ex rel. McCormick v. School District of Mamaroneck*, 370 F.3d 275, 291 (2d Cir. 2004). As noted above, the Complaint includes the following allegation:

> Upon information and belief, beginning at least in or around 2011 and at all relevant times, Defendants Canisius, Huckle and Maher directed, controlled, managed, and conducted the Canisius College Cross-Country/Track and Field Team in a manner which was hostile and discriminatory toward women and lesbians, and which fostered, promoted and condoned harassment, abuse and even sexual assault against women and lesbians.

(Doc. 1 ¶ 26.) Part of that alleged discriminatory conduct was the alleged failure to allocate resources equally between male and female team members. (*Id.* ¶ 28.) The College asserts that "none of the alleged differences in treatment—including the types of clothing furnished to student-athletes, coaching time, travel benefits and accommodations, "and the manner of treatment by the coaching staff"—constitute a "sex- or sexuality-based disparity so substantial that it effectively denied any women . . . an 'athletic opportunity' at Canisius." (Doc. 12-1 at 20.)

Plaintiffs fault the College for seeking to analyze these alleged differences as "[s]eparate and apart from Glavin's misconduct." (*Id.*) They maintain that their "central allegation" is that "they were subjected to sexual assaults based on Defendants' cultivation of a culture that fostered and condoned those sexual assaults." (Doc. 22 at 12.) The College interprets that argument as an admission that Plaintiffs "have no viable unequal treatment theory, which is premised on an unequal resource allocation between male and female athletes." (Doc. 25 at 13.)

Reviewing applicable Title IX regulations and a "Policy Interpretation," the *McCormick* court held that "a disparity in one program component (i.e., scheduling of games and practice

times) can alone constitute a Title IX violation if it is substantial enough in and of itself to deny equality of athletic opportunity to students of one sex at a school." *McCormick*, 370 F.3d at 293. "[C]ompliance is assessed by first determining whether a difference . . . has a negative impact on one sex, and then determining whether that disparity is substantial enough to deny members of that sex equality of athletic opportunity." *Id.* Schools have "considerable flexibility" in complying with this requirement of Title IX. *Id.* "[A] disparity disadvantaging one sex in one part of a school's athletics program can be offset by a comparable advantage to that sex in another area." *Id.* And "a finding of compliance may still be justified if the differences are the result of nondiscriminatory factors." *Id.* at 297.

The College argues that some of the differences alleged in the Complaint had no negative impacts on female student-athletes. For example, regarding the Nike apparel that the male athletes received, the College asserts that Plaintiffs fail to allege that the women's apparel was inferior. (Doc. 12-1 at 20.) But in the present procedural context, the court can reasonably infer that the apparel the women team members received was inferior. And the College does not dispute that some of the alleged differences—like Huckle's alleged focusing his coaching time and effort on male team members—did plausibly have negative impacts on female student-athletes.

The College nevertheless maintains that, under *McCormick*, none of the alleged differences were "substantial enough" to deny equality of "athletic opportunity." This case is somewhat different than *McCormick* because Plaintiffs do not allege a disparity in the scheduling of games and practice time. *McCormick*, 370 F.3d at 289 (citing 34 C.F.R. § 106.41(c)(3)). But Plaintiffs do allege disparities in the provision of equipment and supplies, 34 C.F.R. § 106.41(c)(2), in the opportunities to receive coaching, *id.* § 104.51(c)(5), and in

accommodations during away meets, *id.* § 104.51(c)(9).  To evaluate compliance with these

regulations, the court considers the nonexclusive factors listed in the same Policy Interpretation

document that the *McCormick* court considered: Title IX of the Education Amendments of 1972,

A Policy Interpretation, Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413 (Dec. 11,

1979), https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html.

For equipment and supplies, the court examines the equivalence of quality, amount,

suitability, maintenance, and availability.  *Id.* at 71,416.  For opportunities to receive coaching,

the court examines the relative availability of coaches and assistants.  *Id.*  Regarding housing, the

court examines the housing provided and any special services as part of housing arrangements.

*Id.* at 71,417.  Here, as noted above, the court can infer at this stage that the apparel the women

team members received was inferior.  The Complaint expressly alleges that Huckle focused his

coaching time and effort on the male team members.  (Doc. 1 ¶ 36.)  And the Complaint alleges

that only two male athletes were assigned to each hotel room, whereas Huckle arranged most

hotel rooms to have three women in them.  (*Id.* ¶ 38.)  Drawing all reasonable inferences in

Plaintiffs' favor, the alleged differences—particularly when considered in combination—are

sufficiently substantial to allege a plausible claim of unequal treatment under Title IX.

### 2. Hostile Environment

Count I includes an assertion that the College "allowed and fostered" a "hostile"

educational and athletic environment.  (Doc. 1 ¶ 110.)  The court perceives this to be a Title IX

hostile education environment claim.  Such claims are "governed by traditional Title VII 'hostile

environment' jurisprudence."  *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d

81, 89 (2d Cir. 2011) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744 (2d Cir. 2003)).

"A Title IX plaintiff must show that [she] subjectively perceived the environment to be hostile or

abusive and that the environment objectively was hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of [her] educational environment." *Id.*

The College argues that Plaintiffs have failed to state a hostile environment claim under Title VII. (Doc. 12-1 at 24.) Referring to the allegation that two team members "harassed" JD2 after she resigned from the team (Doc. 1 ¶ 91), the College argues that the Complaint alleges only a "one-time harassment of unspecified type, on an unidentified date by two unidentified persons," and that this is insufficient to establish a plausible Title VII hostile environment claim. (Doc. 12-1 at 24.) Presumably because they do not oppose dismissal of their Title VII claims (Doc. 22 at 2), Plaintiffs' opposition memorandum does not address the College's argument for dismissal of the Title VII hostile-work-environment claim.

Plaintiffs' Title IX hostile education environment claim is governed by traditional Title VII hostile environment jurisprudence. But that does not mean that the court is limited to analyzing the environment that Plaintiffs experienced after their resignations from the team and during the time that they were performing service work such as doing the laundry. To evaluate that claim, the court must consider the allegations regarding events before that time, including, for example, the alleged unequal treatment discussed above, Huckle's alleged "singling out" and mocking the female athletes (Doc. 1 ¶¶ 29–34), Huckle's alleged "expectation" that female athletes attend team parties (*id.* ¶ 53), his alleged instruction that female team members not mention Glavin's conduct to incoming freshman (*id.* ¶ 64), and his alleged chasing and screaming at JD2 (*id.* ¶ 84). Since the College has offered no argument or analysis on these issues, the court declines to dismiss the portion of Count I that includes a hostile educational environment claim.

**B.    "Pre-Assault" Claims—"Deliberate Indifference"**

Canisius College does not seek Rule 12(b)(6) dismissal of the portion of Count I where

Plaintiff JD3 asserts a "pre-assault" claim. (Doc. 12-1 at 12 n.1.) The court therefore analyzes

the College's challenge to JD1 and JD2's "pre-assault" Title IX claims.

Plaintiffs describe their pre-assault claims as "based on the defendants' ongoing

discrimination and harassment of women within the cross-country team, which constituted a

policy of deliberate indifference to reports of sexual misconduct, leading and contributing to the

sexual assault of each plaintiff." (Doc. 22 at 4.) In support of their "pre-assault" theory,

Plaintiffs rely on *Karasek v. Regents of University of California*, 956 F.3d 1093 (9th Cir. 2020).

The *Karasek* court held:

> [A] pre-assault claim should survive a motion to dismiss if the plaintiff plausibly
> alleges that (1) a school maintained a policy of deliberate indifference to reports of
> sexual misconduct, (2) which created a heightened risk of sexual harassment that
> was known or obvious, (3) in a context subject to the school's control, and (4) as a
> result, the plaintiff suffered harassment that was "so severe, pervasive, and
> objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access
> to the educational opportunities or benefits provided by the school."

*Id.* at 1112 (alterations in original) (footnote omitted) (quoting *Davis ex rel. LaShonda D. v.*

*Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). In reaching its conclusion, the *Karasek*

court found the decision in *Simpson v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir.

2007), to be persuasive. *Karasek*, 956 F.3d at 1112. The Second Circuit has not addressed "pre-

assault" Title IX claims, but this court has cited both *Simpson* and *Karasek* favorably. *See Posso*

*v. Niagara Univ.*, 518 F. Supp. 3d 688, 697–99 (W.D.N.Y. 2021).

"A defendant acts with deliberate indifference for Title IX purposes 'when the

defendant's response to known discrimination is *clearly* unreasonable in light of the known

circumstances.'" *Id.* at 697 (quoting *Roskin-Frazee v. Columbia Univ.*, No. 17 Civ. 2032 (GBD),

2018 WL 6523721, at *4 (S.D.N.Y. Nov. 26, 2018)). "The clearly unreasonable standard

16

requires more than mere negligence; it is a high standard that seeks to eliminate any risk that an educational institution would be liable in damages not for its own official decision but instead for another individual's independent actions." *Id.* (cleaned up). "'[A] plaintiff must allege additional facts beyond past incidents of assault on campus to sustain a pre-assault Title IX claim,' but those facts need only give the school notice 'of a heightened risk that is specific enough to allow it to remedy such a policy.'" *Id.* at 699 (quoting *Tubbs v. Stony Brook Univ.*, No. 15 Civ. 0517 (NSR), 2016 WL 8650463, at *9 (S.D.N.Y. Mar. 4, 2016)).

The College seeks dismissal of JD1 and JD2's pre-assault claims on two grounds. First, the College argues that the claims are time-barred and that the continuing-violation doctrine does not apply. (Doc. 12-1 at 13.) Second, the College asserts that JD1 and JD2 have failed to state plausible pre-assault claims. (*Id.* at 15.) The court begins with the latter issue. *See, e.g., Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 658 (W.D. Tex. 2017) (addressing plausibility of Title IX claims before analyzing statute-of-limitations defense).

### 1.    Plausibility of JD1 and JD2's Pre-Assault Claims

The College argues that its response to the reports of alleged misconduct identified in the Complaint was not "clearly unreasonable." (Doc. 12-1 at 16.) Plaintiffs insist that they have sufficiently alleged that the College's response to JD1 and JD2's reports was clearly unreasonable. (Doc. 22 at 7.)[6] The court considers each plaintiff's pre-assault claim below.

---

[6] That argument, apparently, does not include any assertion that the pre-assault claims can be supported by Huckle's alleged conduct at BCSD. Such an assertion would likely be unavailing. *See Emily O. v. Regents of the Univ. of Cal.*, No. CV-20-08159-AB-JEM, 2021 WL 1535539, at *9 (C.D. Cal. Mar. 9, 2021) (allegations that the defendant created a substantial risk of sexual harassment by failing to complete a thorough background check might qualify as negligence but did not rise to level of a policy of deliberate indifference).

### a.    JD1's Pre-Assault Claim

JD1 alleges that the December 15, 2017 sexual assault against her "would never have happened to her had Defendants properly dealt with the reports of Defendant [Glavin's] assaultive conduct toward JD2." (Doc. 1 ¶ 69.)  The court therefore begins by focusing on the College's response to JD2's September 1, 2017 report of a sexual assault to the team's assistant coach.

In the College's view, the assistant coach properly elevated the report to the College's Title IX Coordinator and to the Athletics administration. (Doc. 12-1 at 17.)  But the College maintains that JD2 "does not allege that she then identified her alleged assailant, that she notified the assistant [coach] that he [the assailant] was a student-athlete or someone with whom she would have additional contact, or that she wished to pursue an investigation or any supportive or corrective measures." (*Id.*)  Plaintiffs contend that "[t]his argument misplaces responsibility for addressing JD2's complaint at that time." (Doc. 22 at 9.)  They argue that "[d]espite actual notice to the Title IX coordinator and administration, Canisius College did absolutely nothing to address a reported sexual assault of its student." (*Id.*)  They argue that the College "made no further inquiry, did not open a [Title] IX investigation, did not offer any supportive or corrective measures, or do anything at all in light of the report." (*Id.*)

The reasonableness of the College's response to JD2's September 1, 2017 report depends in part on the substance and context of the report.  For example, where a plaintiff withholds "the facts of any specific sexual assault" and indicates that she does not wish to have it reported, the institution cannot be liable for honoring her request for privacy and taking no further action. *Roskin-Frazee v. Columbia Univ.*, 474 F. Supp. 3d 618, 627 (S.D.N.Y. 2019).  The Complaint in this case includes relatively few details about JD2's September 1, 2017 report of a sexual assault.

It is not entirely clear whether the Complaint alleges that JD2 reported to the assistant coach that Glavin was the assailant, that the assault occurred in his dorm room after an off-campus team party, or that the assault occurred on August 28, 2016. There are no allegations that JD2 requested an investigation or any corrective measures. Still, the court can draw some inferences from the allegations of JD2's report of the sexual assault.

According to the Complaint, JD2 made her report to an assistant coach. (Doc. 1 ¶ 55.) The Complaint further alleges that the assistant coach conveyed JD2's report to the College's Title IX coordinator and to the associate athletic director. (*Id.* ¶ 56.) The court can reasonably infer from that allegation that JD2's report to the assistant coach indicated that the alleged assault was connected to the College's athletic program. And since the Complaint contains no allegations about any response from the College's Title IX office before the alleged December 2017 assault on JD1, the court infers that prior to that date, the Title IX office did not follow up with JD2 or otherwise advise her of her rights and options.

The College concedes that a school's response is inadequate where it provides "no response." *Papelino*, 633 F.3d at 89. But the College asserts that, even where an institution is on actual notice of an alleged sexual assault, it is "not required to proceed in a particular manner, even if there are polices in place that would appear to require the initiation of a formal investigation." *Preusser ex rel. E.P. v. Taconic Hills Cent. Sch. Dist.*, No. 1:10-CV-1347 (MAD/CFH), 2013 WL 209470, at *11 (N.D.N.Y. Jan. 17, 2013) (citing *KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, No. 12-CV-2200 (ER), 2012 WL 1521060, at *7 (S.D.N.Y. Apr. 30, 2012)). The quoted statement in *Preusser* is distinguishable, however, because it concerned the sufficiency of the investigation *after* a Title IX grievance had been filed.

Regarding the events *before* the grievance was filed, the court in that case found that the school district's response was "immediate, thorough and reasonable." *Id.* at *10.

Plaintiffs' allegations in the light most favorable to them suggest the opposite. Here, JD2's report to the assistant coach in September 2017 was only a report; it was not a formal complaint or grievance. The College's alleged failure to follow up at all (at least until the Title IX investigation began in October 2018) on a report of a sexual assault against a student-athlete is inexplicable. After the assistant coach conveyed JD2's report to the College's Title IX coordinator, a prompt follow-up was called for, including a communication with JD2 and an explanation of her rights and options. This is so even though JD2's report was of a sexual assault from a year earlier. *Cf. Doe v. Sarah Lawrence Coll.*, 453 F. Supp. 3d 653, 666 (S.D.N.Y. 2020) (plaintiff sufficiently alleged that college's response to her report of sexual assault was deliberately indifferent where her meeting with Title IX office "proceeded in a rushed, disorganized and undocumented manner, and the plaintiff was allegedly never fully explained her rights and options").

This single alleged failure to respond is unlikely to plausibly establish a *policy* of deliberate indifference to sexual misconduct. But here, Plaintiffs have also alleged that the College received and failed to act upon anonymous reports of sexual misconduct by male team members through the Callisto tool. (Doc. 1 ¶ 44.) The court infers that the College was aware of some of those alleged reports before JD1 was assaulted. In the court's view, these allegations are sufficient to nudge JD1's pre-assault claim across the line from conceivable to plausible. *See Karasek v. Regents of Univ. of Cal.*, 500 F. Supp. 3d 967, 988 (N.D. Cal. 2020) (plausible policy of deliberate indifference where plaintiff claimed that the university "did not respond *in any way* to three assaults taking place over four years in one of its clubs").

**b.**     **JD2's Pre-Assault Claim**

The alleged August 28, 2016 sexual assault on JD2 was the earliest of the alleged assaults against the plaintiffs.  The College asserts that JD2's pre-assault claim is therefore premised only on the January 2015 news report of a federal investigation regarding how the College handled a complaint of sexual violence.  (Doc. 25 at 11.)  The court agrees that the fact of an investigation is insufficient to support a plausible pre-assault claim.

The Complaint does not supply any details regarding the 2015 federal investigation. Specifically, the Complaint and the WGRZ-TV report cited in the Complaint do not indicate whether the investigation concerned conduct related to the cross-country/track-and-field team or to any College athletic team.  That is not necessarily fatal.  *See Karasek*, 956 F.3d at 1113 (Title IX liability may be imposed "when a school's official policy is one of deliberate indifference to sexual harassment *in any context subject to the school's control*" (emphasis added)).  But the Complaint lacks any details about the investigation's findings or conclusions.[7] Although Plaintiffs are entitled to all reasonable inferences at this stage of the proceedings, the court concludes that it would be improper to infer wrongdoing on the College's part from the "mere existence of an investigation."  *Gray v. Alpha & Omega Semiconductor Ltd.*, No. 20-CV-2414 (RA), 2021 WL 4429499, at *9 (S.D.N.Y. Sept. 27, 2021).

On the other hand, the court disagrees with the College's assertion that JD2's pre-assault claim is premised only on the existence of a prior federal investigation.  As noted above, Plaintiffs have also alleged that the College received and failed to act upon anonymous reports of

---

[7] The court could take judicial notice of any publicly available data on the findings and conclusions of the investigation.  But the court has found no information regarding the Canisius College investigation on the Department of Education's Office of Civil Rights webpage, https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/readingroom.html.

sexual misconduct by male team members through the Callisto tool.  (Doc. 1 ¶ 44.)  The court

infers that the College was aware of some of those alleged reports before JD2 was assaulted.

JD2's pre-assault claim is somewhat weaker than JD1's pre-assault claim because it is not

supported by any prior alleged sexual assault against any identified person.  But in the court's

view, the allegations are sufficient to move JD2's pre-assault claim across the line from

conceivable to plausible.

### 2.   Statute of Limitations

The College argues that JD1 and JD2's pre-assault Title IX claims are time-barred.

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the

answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense

appears on the face of the complaint."  *Conn. Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*,

988 F.3d 127, 131–32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir.

2015)).  With that requirement in mind, the court proceeds to review the limitations period and

how it applies in this case.

Since Title IX does not include an express statute of limitations, and since 20 U.S.C.

§ 1658's four-year catch-all statute of limitations does not apply to Title IX claims, courts apply

"the most appropriate or analogous state statute of limitations."  *Purcell v. N.Y. Inst. of Tech. –*

*Coll. of Osteopathic Med.*, 931 F.3d 59, 62–63 (2d Cir. 2019) (quoting *Curto v. Edmundson*,

392 F.3d 502, 504 (2d Cir. 2004) (per curiam)).  The Second Circuit has held that "personal

injury actions are the 'most closely analogous' to Title IX claims, and thus applied New York's

three-year statute of limitations to Title IX claims."  *Id.* (quoting *Curto*, 392 F.3d at 504).  "In

New York, personal injury claims must be filed within three years from the time the cause of

action accrued."  *Curto*, 392 F.3d at 504.

Federal law governs "accrual" of such claims. *Twersky v. Yeshiva Univ.*, 579 F. App'x 7, 9 (2d Cir. 2014) (summary order). Under federal law, "[a] claim generally accrues 'when it comes into existence,' *i.e.*, 'when the plaintiff has a complete and present cause of action.'" *Id.* (quoting *Gabelli v. S.E.C.*, 568 U.S. 442, 448 (2013)); *see also Kelley v. Ithaca Coll.*, No. 3:18-CV-1082 (GLS/DEP), 2019 U.S. Dist. LEXIS 102636, at *16 (N.D.N.Y. June 18, 2019) (citing the general rule articulated in *Twersky*), *report and recommendation adopted*, No. 3:18-CV-1082 (GLS/DEP) (N.D.N.Y. Jul. 18, 2019), ECF No. 20. But "[a]n exception—the discovery accrual rule—has been applied in certain circumstances . . . . Under the discovery accrual rule, a cause of action accrues 'when, with reasonable diligence, the plaintiff has or should have discovered the critical facts of both his injury and its cause.'" *Twersky*, 579 F. App'x at 9 (quoting *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 140 (2d Cir. 2011)); *see also Rotella v. Wood*, 528 U.S. 549, 555 (2000) ("[I]n applying the discovery accrual rule, . . . discovery of the injury, not discovery of the other elements of a claim, is what starts the clock.").

Like the trial court, the Second Circuit in *Twersky* did not decide whether the discovery accrual rule applies to Title IX claims. *See Twersky*, 579 F. App'x at 9; *see also Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 439 (S.D.N.Y. 2014) ("In this case, it is unnecessary to resolve whether Title IX includes a discovery rule . . . ."). Other courts have recently noted that "neither the Supreme Court nor the Second Circuit has explicitly held that the discovery rule should apply to accrual of these [Title IX] claims." *Doe v. Nat'l Ramah Comm'n, Inc.*, No. 16-cv-6869 (NSR), 2018 WL 4284324, at *5 (S.D.N.Y. Sept. 7, 2018). However, in *Irrera v. University of Rochester*, this court suggested that the discovery rule might apply, stating that Title IX claims accrue "the moment the plaintiff knows or has reason to know of the injury that is the basis of the complaint." No. 15-CV-6381, 2016 WL 9447210, at *2 (W.D.N.Y. May 23,

2016) (quoting *Twersky*, 993 F. Supp. 2d at 437), *aff'd in part, rev'd in part, and remanded sub nom. Irrera v. Humpherys*, 859 F.3d 196 (2d Cir. 2017).[8]

Critically, though, *Twersky* and *Irrera* did not involve "pre-assault" Title IX claims. Federal trial courts that have considered accrual of pre-assault claims have reached differing conclusions. *See Karasek*, 500 F. Supp. 3d at 978 (noting that some district courts have held that the limitations period for a pre-assault claim "begins at the time of a plaintiff's assault" whereas other courts have held that such claims accrue "when the plaintiff knew or should have known of the alleged policy of deliberate indifference"). This court joins the district court in *Karasek* and those courts that have held that "a plaintiff's Title IX pre-assault claim accrues when the plaintiff knows or has reason to know of the school's policy of deliberate indifference that created a heightened risk of harassment." *Id.*

The court concurs with the reasoning in *Karasek* that in pre-assault cases, "the injury that is the basis of the plaintiff's action is not the assault" but is instead the school's "policy of deliberate indifference that created a heightened risk of harassment, which is ultimately causally connected with the assault." *Id.* at 979. This is consistent with the general accrual rule—accrual when the plaintiff has a complete and present cause of action—because in pre-assault claims "the actor committing the assault is different than the one who would be liable under Title IX." *Id.* at 980. And this is also consistent with the discovery accrual rule, since the plaintiff "must be put on notice not just of the concrete injury but of its 'cause'"—and the "cause" for purposes of a pre-assault claim "is the school's alleged policy, not just the assault itself." *Id.* at 979.

---

[8] Other district courts have reached similar conclusions. *See A.T. v. Everett Sch. Dist.*, 300 F. Supp. 3d 1243, 1258 (W.D. Wash. 2018) (applying federal discovery rule to Title IX claim).

24

Here, it does not appear from the face of the Complaint that—at the times that Glavin allegedly assaulted them or at any time before April 19, 2018—JD1 or JD2 knew or had reason to know of the College's alleged policy of deliberate indifference to reports of sexual misconduct that created a heightened risk of sexual assault. The court therefore cannot decide the College's statute-of-limitations defense under the present procedural posture. Since the court cannot say that JD1 and JD2's pre-assault claims did not accrue within the three-year limitations period, it is unnecessary to reach their argument that the continuing-violation doctrine applies.

### C.     "Post-Assault" Claims—"Deliberate Indifference"

Initially, it is unclear whether the College seeks dismissal of JD3's post-assault claim. The College concludes its motion by asserting that "all claims except JD3's Title IX '*pre-assault*' claim and the Title IX retaliation claim asserted by JD1 and JD2 should be dismissed." (Doc. 12-1 at 33 (emphasis added).) That suggests that the College is seeking dismissal of JD3's *post-assault* deliberate-indifference claim. But the discussion in the College's motion refers only to JD1 and JD2's (not JD3's) deliberate-indifference claims. (*Id.* at 13–18.) Plaintiffs conclude that the College has not moved to dismiss JD3's post-assault claim. (Doc. 22 at 1–2.) The court agrees with Plaintiffs on this point.

The College's challenges to JD1 and JD2's post-assault Title IX claims are similar to its challenges to the pre-assault claims. The College raises a statute-of-limitations argument and an argument that its response after the alleged sexual assaults was not "clearly unreasonable." As with the pre-assault claims, the court begins with the plausibility of the claims.

### 1.     Plausibility of Post-Assault Claims

Like pre-assault claims, an essential element of a Title IX post-assault claim is that the school's response was "clearly unreasonable." *Posso v. Niagara Univ.*, No. 19-CV-1293-LJV-

MJR, 2020 WL 8771334, at *10 (W.D.N.Y. Nov. 2, 2020); *see also Karasak*, 956 F.3d at 1105

(listing five elements for a post-assault claim; fourth element is that "the school must have acted

with 'deliberate indifference' to the harassment"); *Karasek v. Regents of Univ. of Cal.*,

534 F. Supp. 3d 1136, 1151 (N.D. Cal. 2021) (response must be "an official decision . . . not to

remedy the violation" (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290

(1998))).   The College argues that JD1 and JD2's allegations fail to demonstrate any "clearly

unreasonable" response to their reports of sexual misconduct.  (Doc. 12-1 at 15–18.)  Plaintiffs

disagree, asserting that the College:

> had actual notice of a series of sexual assaults on female members of the same
> cross-country team over the course of two full years, as well as numerous
> complaints of other forms of discrimination and sexual harassment in the same
> athletic program, and that despite this actual notice, did not even open a [T]itle IX
> investigation or take any other remedial action during that time.

(Doc. 22 at 8–9.)

The court has already concluded that Plaintiffs have plausibly alleged a clearly

unreasonable initial response to JD2's September 1, 2017 report of a sexual assault.  For similar

reasons, the court concludes that Plaintiffs have plausibly alleged a clearly unreasonable initial

response to the February 2018 report of the December 2017 sexual assault against JD1.

Plaintiffs essentially contend that the College unreasonably delayed its response to the

reports of sexual assaults that it received in September 2017 and February 2018.  (*See* Doc. 22

at 9 (asserting that the College "did nothing" between February and October 2018 and that

during that interval "there were multiple further reports and complaints concerning Defendant

Glavin, another attempted sexual assault by Defendant Glavin, and Glavin raped JD3").)  The

College argues that the September 2017 report did not identify Glavin as the assailant and that

the College could not have investigated or adjudicated the conduct "of an alleged perpetrator

whose identity is unknown."  (Doc. 25 at 10.)  Similarly, the College maintains that the

Complaint fails to allege "any particular act or omission which College officials failed to undertake" before October 2018. (*Id.*)

"A school's delayed response constitutes deliberate indifference if it prejudices the plaintiff or if the delay was a 'deliberate attempt to sabotage [the p]laintiff's complaint or its orderly resolution.'" *Emily O. v. Regents of the Univ. of Cal.*, No. CV-20-08159-AB-JEM, 2021 WL 1535539, at *6 (C.D. Cal. Mar. 9, 2021) (alternation in original) (quoting *Karasek*, 956 F.3d at 1106). "This inquiry is driven by the facts of each individual case, not by general guidelines." *Id.* "[T]he reasonableness of a delayed investigation depends heavily upon the surrounding circumstances, including the school's actions throughout the delay." *Id.*

Here, even assuming that the September 2017 report did not identify Glavin as the assailant, the February 2018 report did. And the court infers that the Title IX office did not follow up with JD1 or JD2, advise them of their rights and options, or take any responsive actions—at least not until the Title IX investigation was opened in October 2018. The College's alleged failure to follow up at all during that time on a report of a sexual assault against a student-athlete is inexplicable. A prompt follow-up was called for, including communications with JD1 and JD2 and an explanation of their rights and options. *Cf. Doe*, 453 F. Supp. 3d at 666 (S.D.N.Y. 2020) (student's meeting with Title IX office "proceeded in a rushed, disorganized and undocumented manner, and the plaintiff was allegedly never fully explained her rights and options").

Importantly, for post-assault claims, "deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Posso*, 518 F. Supp. 3d at 703 (quoting *Davis*, 526 U.S. at 644). Here, insofar as the College's delay in acting after learning of the sexual assaults on JD1 and JD2 was deliberately indifferent, there are no

allegations that such conduct caused JD1 or JD2 to suffer further sexual assaults by Glavin. But insofar as the delay meant that no investigation into the conditions on the team was started until October 2018, JD1 and JD2 have plausibly alleged that they continued to face unequal treatment and a hostile educational environment—*see supra* Section I.A—at least until that time. That is sufficient "prejudice" to those plaintiffs to support their deliberate-indifference claims. *Emily O.*, 2021 WL 1535539, at *6.

### 2.    Statute of Limitations

In its motion, the College asserts that JD1 and JD2's post-assault claims accrued before April 19, 2018 and are therefore time-barred. (*See* Doc. 12-1 at 13.) In contrast to their pre-assault claims, JD1 and JD2 do not rely on the continuing-violation doctrine to argue that their post-assault claims are timely. (*See* Doc. 22 at 7 ("The application of the continuous violation doctrine is relevant only to Plaintiffs' pre-assault claims.").) Instead, they argue as follows:

> The post-assault claims and discrimination / sexual harassment claims continue into the limitations period . . . . Despite reports and complaints concerning not only these sexual assaults, but also other instances of discrimination and harassment, reaching high levels of administration including Title IX coordinator and Assistant Athletic Director (see Complaint ¶¶ 56, 57 and 61) Canisius College did not even open an investigation or commence any Title IX process until October 2018, long after all three assaults had taken place. Complaint ¶¶ 76–77. And even then, the Title IX process was limited to direct allegations of defendant Glavin's conduct, while Canisius College has never initiated a Title IX investigation into Defendant Huckle or the allegations of longstanding and widespread discrimination and harassment in the cross-country team. Complaint ¶¶ 78–79.

(*Id.*)

In reply, the College asserts that Plaintiffs have cited no authority for the proposition that "the statute of limitations for a post-assault claim is effectively held in abeyance until defendant responds in a manner plaintiff subjectively assesses as reasonable." (Doc. 25 at 9.) According to the College, the post-assault claims accrued "when the College allegedly had notice but failed to respond in a reasonable manner." (*Id.*) The College maintains those dates are February 2018 for

JD2 (when JD2 reported Glavin's alleged assault and identified him by name) March 2018 for

JD1 (when JD1 made a similar report). (*Id.*)

The court agrees with the College that the statute of limitations for a post-assault claim is

not held in abeyance until defendant responds in a manner that a plaintiff subjectively assesses as

reasonable. But under either the general accrual rule or the discovery accrual rule, the court

cannot conclude from the face of the Complaint that JD1 and JD2's post-assault claims accrued

before April 19, 2018. For the post-assault claims, JD1 and JD2's injuries would be the

discrimination and harassment they allegedly experienced *after* they were allegedly sexually

assaulted. Almost all of those alleged injuries occurred after April 19, 2018. The court

accordingly concludes that the College is not entitled to dismissal of the post-assault claims on

statute-of-limitations grounds.

## II.   Title IX Retaliation (Count II)

Plaintiffs originally brought their Title IX retaliation count against all defendants.

However, Plaintiffs do not oppose dismissal of Count II against individual defendants Huckle

and Maher. (Doc. 22 at 2.) The court accordingly considers the plausibility of Count II against

Canisius College.

The College does not seek dismissal of JD1 and JD2's retaliation claims at this time but

argues that JD3's retaliation claim should be dismissed because the Complaint lacks any

allegation that JD3 "participated in any protected activity, of any sort, at any time." (Doc. 12-1

at 18.) JD3 maintains that the Complaint's allegations sufficiently allege retaliation. (Doc. 22

at 10–11.) She points to the allegations that a team member reported Glavin's "luring" her

(Doc. 1 ¶ 68), a team member reported the rape to Huckle (*id.* ¶ 74), her resignation from the

team (*id.* ¶ 89), Huckle's email to the team (*id.* ¶ 90), and her work in the laundry to keep her

scholarship (*id.* ¶ 91). The College replies that the Complaint lacks any allegation that JD3 *herself* reported the assault "and thus she did not engage in protected conduct." (Doc. 25 at 12.)

"Retaliation against individuals because they complain of sex discrimination is intentional conduct that violates the clear terms of Title IX." *Papelino*, 633 F.3d at 91 (cleaned up). "[A] plaintiff claiming retaliation under Title IX must first establish a *prima facie* case by showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action." *Id.* A "protected activity" includes "a wide range of activities, like reporting discrimination, testifying in a proceeding, or otherwise participating in an investigation about discrimination." *Castro v. Yale Univ.*, 518 F. Supp. 3d 593, 611 (D. Conn. 2021) (citing 42 U.S.C. § 2000e-3(a)).

The original Complaint includes no allegations that JD3 reported discrimination, testified, or participated in any investigation. The one case that JD3 cites on the topic of retaliation—*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)—does not suggest that any of the allegations from the Complaint on which JD3 relies might qualify as "protected activity." The allegations in the proposed amended complaint include some additional detail. The court has considered the allegations that: (1) JD3 stopped attending team parties in September 2018 (Doc. 28-1 ¶ 104); (2) Huckle contacted JD3's parents and told them that the student JD3 was dating would be a bad influence (*id.*); (3) JD3 emailed members of the Athletic Department at the time of her resignation indicating that she resigned due to the assault and "other conduct of the Defendants" (*id.* ¶ 106); and (4) JD3 met with Ms. Pileri (*id.* ¶ 107).

JD3's June 2019 email to the Athletic Department and her meeting with Ms. Pileri likely qualify as protected activities. The College does not argue otherwise in its supplemental

memorandum. (Doc. 29.) Whether those activities sufficiently caused an adverse school-related action is a separate question that is not presently before the court. At this time, the court concludes that the College is not entitled to dismissal of JD3's retaliation claim.

## III.   Title VII (Portions of Counts III, IV, VI, and IX)

The College Defendants argue that "numerous grounds mandate dismissal of Plaintiffs' Title VII-based claims." (Doc. 12-1 at 20.) In response, Plaintiffs have withdrawn their Title VII claims. (Doc. 22 at 12.) The College's motion is therefore moot as to the Title VII-based portions of Counts III, IV, VI, and IX.

## IV.   NYSHRL Claims (Remaining Portions of Counts III, IV, VI, and IX)

The Complaint asserts four classes of claims against the College Defendants under New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 296. Plaintiffs' four NYSHRL theories are: (1) sex discrimination and retaliation (Count III); (2) aiding and abetting sex discrimination (Count IV); (3) hostile work environment (Count VI); and (4) sexual orientation discrimination (Count IX). The College Defendants seek dismissal of all NYSHRL claims against them. They argue that no allegations establish that any plaintiff was a protected College "employee" under the NYSHRL. (Doc. 12-1 at 24.) They also maintain that Plaintiffs fail to plead any actionable "workplace" sex discrimination, discrimination based on sexual orientation, retaliation, or a hostile work environment. (*Id.* at 18, 22–24, 25–26.)

### A.   Counts III and IV

As to Counts III and IV, Plaintiffs' opposition memorandum quotes the following NYSHRL provision:

> It shall be an unlawful discriminatory practice for an educational institution to deny the use of its facilities to any person otherwise qualified, or to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, gender identity or expression, military status, sex, age or

marital status, except that any such institution which establishes or maintains a policy of educating persons of one sex exclusively may admit students of only one sex.

N.Y. Exec. L. § 296(4). Although the Complaint refers specifically to § 296(1)—which covers "employers"—and not to § 296(4), the court concludes that a fair reading of the NYSHRL claims against the College must include reference to § 296(4). Thus, while Plaintiffs were not College "employees" protected under § 296(1), they were undoubtedly "students" protected under § 296(4). This neutralizes the College Defendants' arguments that the NYSHRL claims in Counts III and IV fail because Plaintiffs were not "employees."

The College Defendants assert that Counts III and IV fail for additional reasons (Doc. 12-1 at 25), but it appears that these "additional" reasons largely overlap with the arguments about Plaintiffs not being "employees." The College Defendants assert that Plaintiffs have failed to plead actionable "workplace" sex discrimination or retaliation. (Doc. 12-1 at 22–23, 25.) But Plaintiffs have pleaded actionable sex discrimination claims and pre- and post-assault claims. *See supra* Part I. The College is not entitled to dismissal of any retaliation claim at this time. *See supra* Part II. The fact that the alleged discrimination and retaliation did not occur at any of the plaintiffs' "workplace" is immaterial. As stated above, the court interprets the Complaint to include a claim under N.Y. Exec. L. § 296(4).[9]

---

[9] The court therefore rejects the College Defendants' argument that Plaintiffs' withdrawal of their Title VII claims dooms their NYSHRL claims. It is true that NYSHRL claims and Title VII claims are generally "analytically identical"; for that reason this court in *Williams v. Amalgamated Transit Union Local 282* concluded that a plaintiff's abandonment of her Title VII claim was also an abandonment of her NYSHRL claim. No. 13-CV-6488-FPG, 2017 WL 1046753, at *3 (W.D.N.Y. Mar. 20, 2017). But *Williams* did not involve a claim under § 296(4) or any exception to the general rule that NYSHRL claims and Title VII claims involve the same analysis. Here, in contrast, § 296(4) specifically extends protections to students.

Although the College Defendants have not raised this issue, the court notes that claims under N.Y. Exec. L. § 296(4) may only be raised against educational institutions, not employees. *See Novio v. N.Y. Acad. of Art*, 286 F. Supp. 3d 566 (S.D.N.Y. 2017) (section 296(4) "applies only to education corporations, which the employees obviously are not" (quoting *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 604 (S.D.N.Y. 2011))).  The court will accordingly dismiss Count III as against Huckle and Maher.

Regarding Count IV—the "aiding and abetting" count under N.Y. Exec. L. § 296(6)— Huckle and Maher argue that Plaintiffs' failure to state an NYSHRL discrimination claim against the College precludes an aiding-and-abetting claim against the individual College Defendants. (Doc. 12-1 at 27.)  It is true that an aiding-and-abetting claim under § 296(6) requires an underlying violation. *See Boonmalert v. City of New York*, 721 F. App'x 29, 34 (2d Cir. 2018) (summary order); *Housel v. Rochester Inst. of Tech.*, 6 F. Supp. 3d 294, 316 (W.D.N.Y. 2014) ("[A]iding and abetting 'is only a viable theory where an underlying violation has taken place.'" (quoting *Falchenberg v. N.Y. State Dep't of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009))).  But for the reasons discussed above, the court concludes that Plaintiffs have stated a plausible NYSHRL discrimination claim against the College.  The individual College Defendants are not entitled to dismissal of Count IV on the basis of a lack of a plausible underlying violation.

## B.    Count VI

Plaintiffs do not appear to rely on N.Y. Exec. L. § 296(4) for their hostile work environment claim.  Instead, this claim appears to be brought under § 296(1), with the College functioning as JD2 and JD3's "employer" during the time that they were required to do laundry to retain their athletic scholarships after resigning from the team.  (*See* Doc. 1 ¶ 138.)  JD2 and JD3 allege that the working environment was hostile for them because they were required to do

that work "to keep their scholarship despite the fact they were victims of sexual assault and rape." (*Id.*)

The College Defendants assert that the conditions of this "employment" do not rise to the requisite level of actionable hostility. (*See* Doc. 12-1 at 24, 25–26.) Plaintiffs insist that they have alleged "specific acts that included sexual assault, sex discrimination, sexual orientation discrimination and retaliation sufficient to constitute a hostile work environment that is actionable under NY state law, and sufficiently pled to defeat the Motion to Dismiss." (Doc. 22 at 14.)

As the court understands it, Plaintiffs do not rely on any particular harassing conduct during the time that they were doing the laundry work (although JD2 does allege—in a conclusory fashion—that she was harassed by two members of the team on one occasion). Rather, Plaintiffs' theory appears to be that the working environment was "hostile" because it put them in proximity to their former teammates. (*See* Doc. 1 ¶ 91.) The court considers that theory in the context of the factors enumerated in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993). The Supreme Court in that Title VII case stated that courts evaluating whether an environment is "hostile" or "abusive" must consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. The effect on psychological well-being is also relevant. *Id.*

Even drawing all reasonable inferences in Plaintiffs' favor, none of these factors suggests that the environment of the laundry job was sufficiently hostile or abusive. Plaintiffs allege only a single occasion when two members of the team harassed JD2. That conclusory allegation is insufficient to demonstrate a hostile environment. There are no other allegations of adverse

conduct affecting JD2 or JD3 while they were working in the laundry.  There are no allegations

that JD2 and JD3 were forced to work in the proximity of any alleged harasser.  *Cf. Linder v.*

*City of N.Y.*, 263 F. Supp. 2d 585, 594 (E.D.N.Y. 2003) (factfinder could conclude that having to

work close to attacker could unreasonably interfere with plaintiff's work performance).

Although that work might have been awkward or uncomfortable for JD2 and JD3 in light of their

experiences while members of the team, Plaintiffs' allegations fail to show any sufficiently

adverse conduct during that time.

      **C.**    **Count IX**

The College Defendants assert that Plaintiffs have failed to state an NYSHRL claim for

discrimination based on sexual orientation.  (Doc. 12-1 at 26.)  Insofar as this argument is

premised on the lack of a relevant "workplace," the court rejects it for the same reasons as above.

The court interprets the Complaint to include a claim under N.Y. Exec. L. § 296(4).

**V.**    **Negligence (Count V)**

The College Defendants assert multiple arguments for dismissal of Plaintiffs' negligence

count.  (Doc. 12-1 at 27–30.)  In response, Plaintiffs have withdrawn Count V.  (Doc. 22 at 2.)

The College Defendants' motion is therefore moot as to Count V.

**VI.**    **Negligent Hiring and Supervision (Count VII)**

The College seeks dismissal of Count VII on the grounds that the claim is for failure to

prevent injury while acting within the scope of employment and that the Complaint lacks any

allegations that Huckle acted outside that scope.  (Doc. 12-1 at 30; *see also* Doc. 29 at 1.)

Plaintiffs maintain that they "do allege that Defendant Huckle acted outside the scope of his

employment, that he was unfit to be placed in a position of authority over young women, and

that Defendant Canisius College knew or should have been aware of information about prior

misconduct which should have prevented Canisius College from hiring him to coach young women." (Doc. 22 at 15; *see also* Doc. 30 at 1.) The College argues that Plaintiffs' allegations about Huckle's conduct at BCSD are asserted "upon information and belief" and are therefore "ineffective to plead acts or omissions within plaintiffs' knowledge." (Doc. 25 at 7; *see also* Doc. 29 at 1.) Plaintiffs reply that they are relying "on third-party witnesses and information available in the public domain to make these allegations." (Doc. 30 at 2.)

"To state a claim for negligent supervision, hiring, training or retention of employees, a plaintiff must allege, in addition to the usual elements of negligence, that the defendant employer "knew of [an] employee's propensity to commit the alleged acts or that defendant should have known of such propensity had it conducted an adequate hiring procedure.'" *AA ex rel. BB v. Hammondsport Cent. Sch. Dist.*, 527 F. Supp. 3d 501, 508 (W.D.N.Y. 2021) (alteration in original) (quoting *N.U. ex rel. Amar v. E. Islip Union Free Sch. Dist.*, No. 16-cv-4540 (SJF)(ARL), 2017 WL 10456860, at *16 (E.D.N.Y. Sept. 15, 2017)). "The employee must also have been acting *outside* the scope of his or her employment." *Id.*; *see also Rich v. Fox News Network, LLC*, 939 F.3d 112, 129–30 (2d Cir. 2019) ("The employee also must not be acting within the scope of his or her employment otherwise the employer would only be liable vicariously under the theory of *respondeat superior*, and not for negligent supervision or retention." (cleaned up)); *Ahluwalia v. St. George's Univ., LLC*, 63 F. Supp. 3d 251, 263 (E.D.N.Y. 2014) (under New York law, "where an employee acts within the scope of his or her employment, the employer cannot be held liable for a claim of negligent hiring, retention, or training" (quoting *Barnville v. Mimosa Cafe*, No. 1:14-CV-518 (GHW), 2014 WL 3582878, at *2 (S.D.N.Y. July 10, 2014))).

## A.      Knowledge of Propensity

It is true that a plaintiff may make allegations "upon information and belief" where "the facts are peculiarly within the possession and control of the defendant" or where "the belief is based on factual information that makes the inference of culpability plausible." *Teixeria v. St. Jude Med. S.C., Inc.*, 193 F. Supp. 3d 218, 225–226 (W.D.N.Y. 2016) (quoting *Arista Recs. LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).  And Plaintiffs do use that pleading device for some of their allegations regarding Huckle's prior employment at BCSD.  (Doc. 28-1 ¶¶ 27–29, 37–39.)  However, most of the relevant allegations of *fact* appear to be based on witness reports.  (*See id.* ¶¶ 26, 30–36.)  The court concludes that the proposed amended complaint adequately alleges facts that could support a conclusion that the College knew or should have known that Huckle had a propensity to mistreat his female athletes.

## B.      Scope of Employment

"Under New York law, an employee's tortious acts fall within the scope of his employment if 'done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions.'" *Zeranti v. United States*, 358 F. Supp. 3d 244, 253 (W.D.N.Y. 2019) (quoting *United States v. Tomscha*, 150 F. App'x 18, 19 (2d Cir. 2005)).  "On the other hand, conduct falls outside the scope of employment if done 'solely for personal motives unrelated to the furtherance of the employer's business.'"  *Id.* (quoting *Catania v. Herbst*, 916 F. Supp. 2d 266, 272 (E.D.N.Y. 2013)).  Courts consider the following factors to evaluate whether acts were done within the scope of employment:

> [1] the connection between the time, place and occasion for the act; [2] the history of the relationship between employer and employee as spelled out in actual practice; [3] whether the act is one commonly done by such an employee; [4] the extent to which the act departs from normal methods of performance; and [5] whether the specific act was one that the employer could reasonably have anticipated.

*Id.* at 254 (bracketed numbers in original) (quoting *Riviello v. Waldron*, 47 N.Y.2d 297, 303, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979)).

"New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." *Id.* at 255 (quoting *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998)); *see also SB ex rel. AB v. Newark Cent. Sch. Dist.*, No. 6:21-CV-06138 EAW, 2022 WL 541773, at *9 (W.D.N.Y. Feb. 23, 2022) (conduct of teaching assistant who persuaded and blackmailed minor student into sending him pornographic photos was "clearly . . . outside the scope of his employment"). But where an employee on duty fails to notice and prevent student-on-student harm, such a failure has been held to be within the scope of employment. *See AA ex rel. BB*, 527 F. Supp. 3d at 508 (no allegation of conduct outside scope of employment where school employee assigned to supervise study hall failed to notice or intervene in student-on-student sexual harassment).

Here, the Complaint does not allege that Huckle himself sexually assaulted the plaintiffs. At the same time, the Complaint alleges more than simple failure on Huckle's part to notice and prevent student-on-student harm. According to Plaintiffs, Huckle "caused and contributed to their injuries by a course of conduct that constituted discrimination and sexual harassment, and which promoted condoned caused and contributed to a culture which led directly and proximately to their sexual assault by Defendant Glavin." (Doc. 22 at 15.) The court therefore refers to the *Riviello* factors on this issue.

The times and places of Huckle's alleged acts of discrimination are all connected to his responsibilities as a coach on the College's athletics team. The allegations do not specify any history between the College and Huckle that would be relevant to the scope-of-employment

issue. However, athletic coaches are obviously not employed to discriminate based on sex or to foster a hostile educational or athletic environment, and such conduct would depart from "normal methods of performance." Finally, consideration of whether the College could reasonably have anticipated Huckle's conduct is bound up with the determination of whether the College had knowledge of any propensity on Huckle's part to mistreat female athletes. The court therefore concludes that the Complaint plausibly alleges that Huckle's alleged conduct was outside the scope of his employment, and thus that Plaintiffs have plausibly alleged a claim of negligent hiring and supervision against the College.

## VII.    Breach of Contract (Count VIII)

In their breach-of-contract claim, Plaintiffs assert that "Defendants breached express and/or implied agreement(s) with Plaintiffs to provide them with scholarships to attend Canisius College." (Doc. 1 ¶ 146.) The College Defendants argue that Plaintiffs' claim is conclusory and fails to specify what agreement was violated or how it was violated. (Doc. 12-1 at 32.) They further contend that "the Complaint does not specify how the College breached any obligation related to 'scholarships,' nor can they since the Complaint does not allege that any scholarships were involuntarily terminated." (*Id.*)

In response, Plaintiffs argue that "Title IX requires a broad statutory interpretation and is in the nature of a contract." (Doc. 22 at 16.) It is true that the Third Circuit in *Doe v. Mercy Catholic Medical Center* stated that Title IX "is in the nature of a contract." 850 F.3d 545, 552 (3d Cir. 2017). But the court in that case was referring to the contractual aspect of Title IX's enactment under the Spending Clause: "In accepting federal funds, States agree to comply with its [Title IX's] mandate." *Id.* (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181–82

(2005)).  Plaintiffs offer no authority for the proposition that students of educational institutions that receive federal funds are parties to the "contract" described in *Mercy*.

To the extent that Plaintiffs are arguing that a Title IX violation automatically establishes a breach of contract, the court rejects that theory.  The two causes of action are different with different elements.  *See Posso*, 518 F. Supp. 3d at 704 (dismissing breach-of-contract claim but allowing Title IX claim to proceed).

## VIII.  New York Child Victims Act (Count X)

The College Defendants assert that New York's Child Victims Act ("CVA"), N.Y. C.P.L.R. § 214-g, creates no standalone claim for relief.  (Doc. 12-1 at 32.)  Plaintiffs do not address the CVA in their opposition memorandum.  The court concludes that Plaintiffs have abandoned this claim.  *See Tojek v. Swift*, No. 20-CV-755Si(F), 2021 WL 2481874, at *6 (W.D.N.Y. May 10, 2021) (plaintiff abandoned claims by failing to address defendant's argument for dismissal), *report and recommendation adopted*, 2021 WL 2477163 (W.D.N.Y. June 17, 2021).

## Conclusion

The College Defendants' Motion to Dismiss (Doc. 12) is MOOT IN PART, GRANTED IN PART, and DENIED IN PART.

Counts I and II for Title IX Discrimination as against Defendants Huckle and Maher are dismissed but remain in the case as against Canisius College.

The College Defendants' motion to dismiss is moot as to the now-withdrawn Title VII-based portions of Counts III, IV, VI, and IX.  Count III is dismissed insofar as it is an NYSHRL claim against Huckle and Maher.  Count VI is dismissed insofar as it is an NYSHRL hostile

work environment claim.  The NYSHRL claims in Counts III, IV, and IX otherwise remain in the case as claims under N.Y. Exec. L. §§ 296(4) and 296(6).

The College Defendants' motion to dismiss now-withdrawn Count V is moot.

Count VII remains in the case.

Counts VIII and X are dismissed.

Dated this 27th day of June, 2022.

Geoffrey W. Crawford, Judge
United States District Court

41